**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| FIDELITY & GUARANTY INSURANCE | § | |
| UNDERWRITERS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-05-0596 |
| | § | |
| NEBA D/B/A NEBA PROPERTIES, *et al.,* | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

Two surety companies, United States Fidelity & Guarantee Company ("USF&G") and Fidelity and Guaranty Insurance Underwriters, Inc. ("FGIU") ( together, "the Sureties"), have filed a number of lawsuits seeking to recover losses on construction bonds issued to two pipeline companies, Pate & Pate, L.L.C. ("LLC") and Pate & Pate Enterprises, Inc. ("Enterprises"). These companies are among several entities owned by Steven V. Pate and members of his family.

On June 5 and 6, 2002, after a series of adverse legal and financial events, Enterprises and LLC informed the Sureties that they were in technical default under the bonds. After unsuccessful efforts to complete the bonded projects, on September 18, 2002, Enterprises and LLC declared formal default on eighty bonds. By the end of 2002, Enterprises and LLC had stopped operating. The Sureties assert over $32,000,000 in actual damages from the defaulted bonds.

In this suit, the Sureties assert claims against only one officer of LLC and Enterprises, Janet Fulp Hruska ("Fulp"), the vice-president of finance for these two Pate entities. The Sureties make similar allegations against Steven Pate, but do not assert causes of action or seek relief against him in this suit. Instead, the Sureties sue financial entities that made loans to LLC, Enterprises, Steven Pate, and other Pate family members and entities, and certain of those entities' officers and directors. In a proposed Second Amended Complaint, the Sureties allege that the banks and certain of their officers and directors conspired with and aided and abetted Pate and Fulp to breach fiduciary duties they owed to the Sureties, and to defraud the Sureties.

The Sureties sued six financial institutions or entities that made original or participation loans to Pate, LLC, or Enterprises: NEBA d/b/a NEBA Properties, Citizens State Bank, First State Bank of Huntsville, Industry Bancshares, Industry State Bank, and Independent Bank f/k/a The Coupland State Bank of Coupland (collectively, "the Lending Banks"). The Sureties also sued four individuals who are officers, directors, or shareholders of those institutions: James E. Blaine, Walter G. Nelson, James E. Lindemann, and Ervin Mieth (collectively, "the Officers and Directors"), and one individual investor, Effie W. Nelson ("E. Nelson"). These defendants are collectively referred to as the "Lender Defendants."

In the original complaint, the Sureties alleged that the Lender Defendants aided and abetted the "primary actors" — Enterprises, LLC, Steven Pate, and Fulp — in breaching fiduciary duties they owed to the Sureties and in committing fraud and "misuse of assets";

engaged in fraudulent transfers; conspired with Enterprises, LLC, Steven Pate, and Fulp to breach fiduciary duties and commit fraud; were negligent in allowing loans and transfers to LLC and Enterprises to occur; and participated in acts of fraudulent concealment, triggering the discovery rule.  The Lender Defendants moved to dismiss the original complaint under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and alternatively moved for more a definite statement under Rule 12(e).  (Docket Entry Nos. 11, 13, 18).  The Sureties responded and filed a First Amended Complaint, adding two of the individual defendants and more detail to the allegations.  (Docket Entry 22).  The Lender Defendants renewed their existing motions and filed new motions to dismiss or alternatively for a more definite statement, as well as a motion to strike portions of the Sureties' response.  (Docket Entry Nos. 26, 28, 33, 35, 43).  The Sureties then filed a motion for leave to file a proposed Second Amended Complaint, (Docket Entry No. 38), to which the Lender Defendants have filed objections, (Docket Entry Nos. 41, 46, 48), to which the Sureties have replied, (Docket Entry No. 50).

In the proposed Second Amended Complaint, the Sureties have added yet more detail to the allegations against the Lender Defendants and deleted certain claims that were originally asserted.  In the proposed Second Amended Complaint, the Sureties no longer assert claims against the Lender Defendants for aiding and abetting or conspiring to commit negligent acts or misrepresentations by Steven Pate, Fulp, Enterprises, and LLC.  The Sureties have also dropped claims that the Lender Defendants were themselves negligent in making or approving the challenged loans.  The Sureties have also dropped claims for

attorneys' fees.  To the extent the motions to dismiss ask this court to dismiss these claims in the Original and First Amended Complaints, the motions are granted.

The critical question raised by the Sureties' motion for leave to amend and the objections and motions to dismiss the claims asserted in the proposed Second Amended Complaint is which parts of the proposed Second Amended Complaint will proceed.  Based on a careful review of the motions, responses and replies, the pleadings, and the controlling law, this court grants in part and denies in part defendants' motions to  dismiss the Original and First Amended Complaints (Docket Entries No. 11, 13, 18, 26, 28, 33, and 35); grants the motion to strike (Docket Entry No. 43); grants in part and denies in part  the Sureties' motion for leave to file the Second Amended Complaint (Docket Entry No. 38); and denies the alternative motions for more definite statement (Docket Entries No. 11, 33).  The result of these rulings:

• dismisses (and denies leave to amend to assert in the proposed Second Amended Complaint) the claims against the Lender Defendants for aiding and abetting in and conspiracy to make negligent misrepresentations, negligence, and the prayer for attorney's fees;

• dismisses (and denies leave to amend to assert in the proposed Second Amended Complaint) the claims against Baine, Nelson, E. Nelson, and Industry Bank as to aiding and abetting and conspiracy to commit fraud arising out of the June 2002 loan, renewal, and related transactions;

• dismisses (and denies leave to amend to assert in the proposed Second Amended Complaint) the claims against Mieth, Lindemann, First State Bank, Industry Bank, and Coupland Bank for aiding and abetting and conspiracy to commit fraud arising out of the June 2002 loan, renewal, and related transactions;

• dismisses (and denies leave to amend to assert in the proposed Second Amended Complaint) the fraudulent transfer claims, the conspiracy to commit fraudulent transfer claims, and the prayer for injunctive relief against Mieth and Liedemann;

• and dismisses (and denies leave to amend to assert in the proposed Second Amended Complaint) the denuding claim as to Lindemann, Mieth, Industry Bancshares, and Industry State Bank, but denies the motion to dismiss the aiding and abetting the denuding of LLC and Enterprises (and grants leave to amend to assert this claim in the proposed Second Amended Complaint).

The following claims may proceed in the Second Amended Complaint:

• the claims against NEBA, Baine, Nelson, E. Nelson, and Industry Bank  for aiding and abetting and conspiracy to breach fiduciary duties arising out the February 2001 loan, the February 2002 loan, and the June 2002 loan, renewal, and related transactions;

• the claims against Mieth, Lindemann, First State Bank, Industry Bank, Industry Bancshares, and Coupland Bank for aiding and abetting and conspiracy to breach fiduciary duties arising out of the June 2002 loan, renewal, and related transactions;

• the claims against NEBA, Baine, Nelson, and E. Nelson for fraudulent transfer;

• the claims for aiding and abetting denuding as a means to pierce the corporate veil of LLC and Enterprises; and

• the claims for fraudulent concealment as a means for triggering the discovery rule.

This court also sets a status conference for **January 12, 2006**, at 9:30 a.m. in Courtroom 11-B.

The reasons for these rulings are explained below.

## I.    The Applicable Legal Standards

### A.    Rule 9(b)

Rule 9(b) states:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

"At a minimum, Rule 9(b) requires that a plaintiff set forth the 'who, what, when, where, and how' of the alleged fraud." *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997) (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 179 (5th Cir. 1997)).   The plaintiff must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams*, 112 F.3d at 177.   "Allegations about conditions of the mind, such as defendant's knowledge of the truth and intent to deceive, however, may be pleaded generally." *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1139 (5th Cir. 1992).

### B.      Rule 12(b)(6)

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6). Rule 12(b)(6) dismissal is appropriate only if there is no set of facts that could be proven consistent with the complaint allegations that would entitle the plaintiff to relief. *Scanlan v. Texas A & M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003). The court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Id.* To avoid dismissal for failure to state a claim, however, a plaintiff must plead specific facts, not mere conclusory allegations. *Kane Enters. v. MacGregor (USA) Inc.*, 322 F.3d 371, 374 (5th Cir. 2003). This court "will thus not accept as true conclusory allegations or unwarranted deductions of fact." *Id.* (quoting *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000)). In considering a motion to dismiss for failure to state a claim, a district court must limit itself to the contents of the pleadings, including attachments. *Collins*, 224 F.3d at 498.

### C.      Rule 12(e)

"If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading." FED. R. CIV. P. 12(e). "The class of pleadings that are appropriate subjects for a motion under Rule 12(e) is quite small — the pleading must be sufficiently intelligible for the court to be able to make out one or more potentially viable legal theories on which the claimant might proceed." 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1376

(1990). "Finally, a complaint, which contains a 'bare bones' allegation that a wrong occurred and which does not plead any of the facts giving rise to the injury, does not provide adequate notice." *Beanal v. Freeport-McMoran, Inc.*, 197 F.3d 161, 164 (5th Cir. 1999) (citing *Walker v. South Cent. Bell Tel. Co.*, 904 F.2d, 275, 277 (5th Cir.1990)).

### D.     Rule 15

Rule 15 of the Federal Rules of Civil Procedure requires leave of the court for a party to file an amended pleading and provides that such leave "shall be freely given when justice so requires."  In deciding whether to grant leave to file an amended pleading, a district court may consider factors such as undue delay; bad faith or dilatory motive on the part of the movant; repeated failure to cure deficiencies by amendments previously allowed; undue prejudice to the opposing party; and futility of amendment.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993).  Leave to amend under Rule 15(a) "shall be freely given when justice so requires," but "is by no means automatic."  *Little v. Liquid Air Corp.*, 952 F.2d 841, 845–46 (5th Cir. 1992); *Addington v. Farmer's Elevator Mutual Ins. Co.*, 650 F.2d 663, 666 (5th Cir. 1981); *Layfield v. Bill Heard Chevrolet Co.*, 607 F.2d 1097, 1099 (5th Cir. 1979).  The decision "lies within the sound discretion of the district court."  *Little*, 952 F.2d at 846.

### III.    The Motions to Dismiss and the Motion for Leave to File the Proposed Second Amended Complaint

#### A.     Background

The causes of action the Sureties assert against the Lender Defendants can generally be divided into two categories.  The first category consists of allegations that certain of the Lender Defendants helped Enterprises and LLC overstate their financial condition.  The Sureties allege that beginning in the mid-1980s, NEBA, a Texas general partnership controlled by its general partners, Baine (a long-standing friend of Steven Pate's) and Nelson, made "off-book" short-term loans to Enterprises.  The Sureties allege that Nelson and his wife, E. Nelson, participated in some of these loans from NEBA.  The Sureties allege that Pate and Fulp improperly recorded these short-term loans.  The Sureties allege that by February 2001, Baine and Nelson knew or had reason to know that the loans were not recorded properly, but were used to inflate the balance sheets of Enterprises and make its financial situation look better than it was.  The Sureties allege that despite this knowledge, NEBA made a new loan to Enterprises on February 23, 2001.  The Sureties allege that they relied on the inaccurate balance sheets in deciding to continue to issue construction bonds.  It appears that the Sureties stopped issuing bonds to Pate entities in late May 2002.

The second category of allegations consists of claims that the Lender Defendants and the Officers and Directors sought to protect the assets of the Pate family businesses by encumbering those assets to keep them from creditors with superior claims, including the Sureties.  Two loans are alleged.  One is a February 2002 loan from NEBA to LLC, an entity created in August 2001 allegedly to receive assets transferred from Enterprises.  This loan was allegedly made in NEBA's name, but the funds came from loans made to Baine and Nelson by Industry Bank.  The Suretities allege that this loan was collateralized by a lien on

the assets of LLC.  The Sureties allege that this lien "tied-up" the assets that had been transferred to LLC from Enterprises.  The second loan is a "Participation Loan" allegedly made to LLC at Baine's instigation by First State Bank, Industry Bank, and Coupland Bank, on June 5, 2002.  (These banks are collectively referred to as "the Participation Loan Banks.")  The Sureties allege that this loan was to "tie-up assets that had not yet been transferred to LLC."  (Docket Entry No. 38, Ex. 1, ¶ 75).  This Participation Loan was allegedly approved by two of the Officer and Director Defendants: Mieth (Director of Coupland Bank and Senior Vice President and Director of Industry Bank and of Industry Bancshares); and Lindemann (Chairman of Industry Bank and Chairman of Coupland Bank and Chairman and shareholder of Industry Bancshares).  The Sureties allege that Baine, Nelson, Lindemann, Mieth, and the Participation Loan Banks knew or should have known that the June 5, 2002 Participation Loan violated accepted banking practices and facilitated the Pates' retention of control over assets that would otherwise have been subject to creditors' claims.

The Sureties allege that NEBA, Baine, Nelson, and to a small extent, E. Nelson, were involved in the first category of loans that were improperly recorded so as to misrepresent the financial condition of Enterprises and LLC.  The Sureties allege only minimal involvement in the short-term loans from NEBA by any of the banks named as defendants. The Sureties only allege that NEBA generally used offices at First State Bank and CSB (sold in 1997 to Industry Bancshares), and that Baine and Nelson were shareholders of Industry Bancshares and on the board of directors and loan committee of CSB.

As to the second category of loans, the Sureties allege that NEBA, Baine, Nelson, and Industry Bank made the February 2002 loan to LLC and that Baine and Nelson assisted in securing the approval for the June 2002 Participation Loan and its renewal.  The Sureties allege that Mieth, Lindemann, First State Bank, Industry Bank, and Coupland Bank were involved in the Participation Loan and its renewal, but with the exception of Industry Bank, do not allege that they were involved in the other challenged loans.

### B.    Defendants' Motion to Strike

In their omnibus response to the initial motions to dismiss, the Sureties asked that this court take judicial notice of "the existence of the findings contained in" consent judgments entered in two other cases in the Southern District of Texas, one in a district court and one in a bankruptcy court.  The Sureties attached the judgments as exhibits to the request. (Docket Entry No. 39, ¶ 12; Exs. B & C).  The present defendants were not parties to either of those cases, and the consent judgments specifically state that the underlying facts remain subject to dispute.  (*Id.*, Exs. B and C, ¶¶ 10, 13–14, 18).  Defendants objected to this request for judicial notice and moved to strike the exhibits and references to the exhibits in the pleadings.  (Docket Entry No. 43).

Judicial notice is a substitute for formal proof.  Under the Federal Rules of Evidence, the scope of judicial notice covers only adjudicative facts.  *See* FED. R. EVID. 201(a).  The party requesting judicial notice has the burden of persuading the trial judge that the fact is appropriate for judicial notice, a showing that requires that the fact is not subject to reasonable dispute.  It has become a commonly-accepted practice to take "judicial notice"

of a court's records.  *See* 3 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE ¶¶ 201 [03]

at 201-35–201-40 (1992); *MacMillan Bloedel Ltd. v. Flintkote Co.*, 760 F.2d 580, 587 (5th

Cir. 1985); *Wilson v. Huffman (In re Missionary Baptist Foundation of America)*, 712 F.2d

206, 211 (5th Cir. 1983).  Taking "judicial notice of court records" generally has a limited

purpose, such as  simplifying the process of authenticating documents or overcoming best

evidence problems.  There is a crucial distinction between taking judicial notice of the fact

that a document has been filed in a particular case and taking judicial notice of the truth or

falsity of contents of any such document for the purpose of making a finding of fact.

A court may take judicial notice of another court's judicial action, *see Karaha Bodas

Co. v. Perusahaan Perambangan Minyak Dan Gas Bumi Negara*, 2003 WL 21027134, at *4

(5th Cir. Mar. 5, 2003), and a federal court is permitted to refer to matters of public record

when deciding a Rule 12(b)(6) motion to dismiss, *Cinel v. Connick,* 15 F.3d 1338,1343 n.6

(5th Cir. 1994).  The fact that a judicial action was taken is indisputable and is amenable to

judicial notice.  *See Taylor v. Charter Med. Corp.*, 162 F.3d 827, 831 (5th Cir. 1998); *Gray

ex rel. Rudd v. Beverly Enterprises-Mississippi, Inc.*, 390 F.3d 400, 407 n.7 (5th Cir. 2004).

A court cannot, however, properly take judicial notice of "findings of fact" allegedly made

by another trial court and apply them with preclusive effect in deciding a motion to dismiss.

*United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994).  That rules applies with

particular force here, given the language in the consent judgments that they do not resolve

disputed underlying facts.

The request to take judicial notice is denied; the motion to strike is granted.

**C.     The Motions to Dismiss the Claims of Aiding and Abetting and Conspiracy to Commit Breaches of Fiduciary Duty and Fraud**

The Lender Defendants contend that the claims of aiding and abetting the primary actors' breaches of fiduciary duty and fraud and the claims of conspiracy with the primary actors to commit breach of fiduciary duty and fraud should be dismissed or significantly narrowed.  (Docket Entry Nos. 11, 26, 28, 33, 35, 39).  Under Texas law, aiding and abetting is a theory used to impose joint liability on additional parties for independently tortious conduct.  *See Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996).  Texas has explicitly recognized claims for aiding and abetting a breach of fiduciary duty and aiding and abetting the commission of fraud.  *See Toles v. Toles*, 113 S.W.3d 899, 911 (Tex. App. – Dallas 2003, no pet.); *Prostok v. Browning*, 112 S.W.3d 876, 899 (Tex. App. – Dallas 2003, pet. granted); *Hendricks v. Thornton*, 973 S.W.2d 348, 372–73 (Tex. App. – Beaumont 1998, no pet.); *Kline v. O'Quinn*, 874 S.W.2d 776, 786 (Tex. App. – Houston [14th Dist.] 1994, writ denied); *see also Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 645 (5th Cir. 1999) (applying Texas law).  A third party may be held liable for aiding and abetting a breach of fiduciary duty if the "third party knowingly participates in the breach of duty of a fiduciary." *Kline v. O'Quinn*, 874 S.W.2d 776, 786 (Tex. App. – Houston [14th Dist.] 1994, writ denied) (quoting *Kinzbach Tool Co. v. Corbett Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942), and citing *Tinney v. Team Bank*, 819 S.W.2d 560, 564 (Tex. App. – Fort Worth 1991, writ denied); *Horton v. Robinson*, 776 S.W.2d 260, 266 (Tex. App. – El Paso 1989, no writ); *Chien v. Chen*, 759 S.W.2d 484, 487 n.2 (Tex. App. – Austin 1988, no writ)).  At a

minimum, a plaintiff alleging aiding and abetting breach of fiduciary duty must allege gross negligence on the part of the defendant. *See Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996) ("Consistent with our decisions . . . we would require allegations of specific intent, or perhaps at least gross negligence, to state a cause of action.").

Under Texas law, fraud requires "a material representation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury." *Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998). A promise to do something in the future constitutes fraud only if the promise is made with no intention of performing it. *Id.* at 48. A "mere failure to perform a contract is not evidence of fraud." *Id.* The party alleging fraud must present evidence relevant to the other party's intent when the representation was made. Actionable fraud based on nondisclosure requires a showing of a duty to disclose. *See Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex. App. – Houston [14th Dist.] 1997, pet. denied). Whether a duty to disclose exists is a question of law. *See id*. "A duty to disclose may arise when there is a fiduciary relationship." *Falcon Enters, Inc. v. Sugar Creek Section 25*, 1999 WL 966645, *7 (Tex. App. – Houston [14th Dist.] Oct. 29, 1999, review denied) (citing *Ho v. Univ. of Texas at Arlington*, 984 S.W.2d 672, 692 (Tex. App. – Amarillo 1998, review denied)).

Under Texas law, a civil conspiracy is defined as "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4)

one or more unlawful, overt acts; and (5) damages as a proximate result." *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005) (citing *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996)) (additional citations omitted). Conspiracy requires proof of specific intent. *Id.* "It is not the agreement itself, but an injury to the plaintiff resulting from an act done pursuant to the common purpose that gives rise to the cause of action." *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925 (Tex. 1980) (citing *Great Nat'l Life Ins. Co. v. Chapa*, 377 S.W.2d 632, 635 (Tex. 1964)). Conspiracy to commit a tort requires that the parties conspire to commit an intentional tort. *Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 617 (Tex. 1996).

Defendants argue that as a matter of law, the primary actors — Pate, Fulp, Enterprises, and LLC — did not breach fiduciary duties to the Sureties, so that the Lender Defendants cannot be liable for aiding and abetting a breach of fiduciary duties. The Lender Defendants assert that a business entity and its principals do not owe fiduciary duties to their creditors under Texas law, removing any basis for a claim of aiding and abetting the primary actors' alleged breach of fiduciary duties to the Sureties. The Lender Defendants further contend that the Sureties have failed to plead the necessary elements of aiding and abetting. The Lender Defendants also argue that because Texas does not recognize a claim for aiding and abetting negligent misrepresentation, this claim must be dismissed.

As to the claim of aiding and abetting the alleged fraud of Pate, Fulp, Enterprises, and LLC, the Lender Defendants argue that the plaintiffs have failed to plead the underlying fraud with the required particularity and have failed to plead facts that would show the

elements necessary for aiding and abetting.  Finally, to the extent any of the aiding and abetting claims can go forward, Lender Defendants assert that the four-year statute of limitations governing the underlying torts (fraud and breach of fiduciary duty) applies to bar any claims based on acts occurring before February 23, 2001.

The first argument, that the aiding and abetting in breaches of fiduciary duty claims must be dismissed because no underlying fiduciary duty existed between the primary actors and the Sureties, is persuasive in only one respect.  The Lender Defendants contend that Texas statutory law does not recognize a fiduciary duty between creditors and a Texas corporation and its principals.  The Sureties do not identify a statutory basis for such a duty. *Cf. F.G. Farah v. Mafrige v. Kormanik, P.C.*, 927 S.W.2d 663, 675 (Tex. App. – Houston [1st Dist.] 1996, no writ) ("The relationship between a borrower and lender is usually neither a fiduciary relationship nor a special relationship. . . .  Specifically, the relationship between a bank and its customers does not usually create a special relationship.") (citing *Mfrs. Hanover Trust Co. v. Kingston Inv. Corp.*, 819 S.W.2d 607, 610 (Tex. App. – Houston [1st Dist.] 1991, no writ.); *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962)).  To the extent the Sureties assert a claim against the Lender Defendants for aiding and abetting breach of a statutorily-created fiduciary duty the primary actors owed to the Sureties, the motion to dismiss is granted.

To the extent this argument rests on Texas common law, it is not persuasive.  The Lender Defendants contend that under Texas common law, a business entity and its principals owe no fiduciary obligation to creditors except when the entity is insolvent.  *See,*

*e.g.*, *Dyer v. Shafer, Gilliland, Davis, McCollum & Ashley, Inc.*, 779 S.W.2d 474, 477 (Tex. App. – El Paso 1989, writ denied). According to defendants, because Texas — unlike Delaware — does not recognize a fiduciary obligation to creditors when a business entity is within the "zone of insolvency" and, because Enterprises and LLC were not insolvent at the time of the alleged fiduciary violations, a breach of fiduciary duty claim is barred as a matter of law. Without an underlying tort of breach of fiduciary duty, the Lender Defendants argue, there can be no aiding and abetting liability.

The Fifth Circuit and district courts in this circuit have recognized that under Texas law, a business entity and its principals owe a fiduciary obligation to creditors when the business entity is within the "zone of insolvency." *See Carrieri v. Jobs.Com, Inc.*, 393 F.3d 508, 534 n.24 (5th Cir. 2004) (applying Texas law and noting that "[o]fficers and directors that are aware that the corporation is insolvent, or within the 'zone of insolvency' as in this case, have expanded fiduciary duties to include the creditors of the corporation"); *Weaver v. Kellogg*, 216 B.R. 563, 583–84 (S.D. Tex. 1997) ("Thus, it appears that under both Delaware law and Texas law, corporate insiders . . . may have a fiduciary duty to the corporation's creditors even when the corporation was not insolvent."). These authorities foreclose defendants' argument on this point.

Defendants also argue that the Sureties have failed to plead aiding and abetting and conspiracy to breach fiduciary duties or to commit fraud with the particularity required under

Rule 9(b).[1]  The Original and First Amended Complaint were deficient in pleading the fraud

and breach of fiduciary duty claims and the derivative aiding and abetting conspiracy claims.

The proposed Second Amended Complaint includes more specific allegations of the primary

actors' breaches of fiduciary duty and fraud and the actions of the Lender Defendants alleged

to constitute aiding and abetting and conspiracy to commit breaches of fiduciary duty and

fraud.   Paragraph 138 of the proposed Second Amended Complaint summarizes these

allegations, as follows:

> 138.  Steve Pate and the Defendants conspired to deceive and defraud,
> both actually and constructively, the creditors of Enterprises and LLC through
> breaches of fiduciary duties, manipulation of creditworthiness, encumbering
> and/or transferring of assets, and concealment of the true financial condition
> of Enterprises and LLC.  Specifically, Baine and Nelson, individually, and on
> behalf of NEBA, ENelson and Industry Bank, agreed with Steve Pate and Fulp
> to provide off-book loans to inflate the cash-on-hand, assets and equity of
> Enterprises and LLC, in order for those entities to obtain and maintain credit
> facilities from financing banks and the Sureties; Baine, individually, and on
> behalf of Nelson, NEBA, First State Bank and Industry Bancshares, agreed
> with Steve Pate and Fulp to encumber and control the assets of Enterprises,
> LLC and Steve Pate, in order to conceal them from the Sureties after
> Enterprises and LLC defaulted on their bond obligations; Lindemann and
> Mieth, individually, and on behalf of Industry Bancshares, Industry Bank, and

---

[1]     Several of the Lender Defendants contend that the Sureties improperly rely on generic "group pleading" that fail to meet Rule 9(b)'s particularity requirement.  (*See, e.g.*, Docket Entry No. 28 at 4).  The Sureties respond that the use of collective terms is appropriate in this case because the various individual defendants (including Lindemann) "engaged in the conduct outlined in the First Amended Complaint as part of their day-to-day work as officers, directors, and general partners of the entity defendants."  (Docket Entry No. 39 at 13).  While group pleading is often disfavored in fraud claims, *see, e.g.*, *Melder v. Morris*, 27 F.3d 1097 (5th Cir. 1994), group pleading by itself does not require dismissal of a fraud claim.  *See, e.g.*, *Zuckerman v. Foxmeyer Health Corp.*, 4 F. Supp. 2d 618, 626 & n.4 (N.D. Tex. 1998) (denying a motion to dismiss a securities fraud pleading partially because the plaintiffs "clearly name each individual defendant whom they allege had a hand in the misrepresentation" but also clarifying that the plaintiffs' reliance on group pleading as to some of the alleged statements did not invalidate the claims "under the theory that high-level corporate officers, as Defendants all are, may be responsible for the statements issued by their company to the public").

Coupland Bank, agreed with Baine, and, by and through Baine, with Steve Pate and Fulp to encumber the assets of Enterprises, LLC, and Steve Pate in order to conceal them from the Sureties after Enterprises and LLC defaulted on their bond obligations; and Nelson and Baine, individually, and on behalf of First State Bank and CSB, agreed with Steve Pate and Fulp to encumber and control the assets of the Pate family in order to conceal them from claims by the Sureties, to control the payment of creditors of Enterprises and LLC needed to continue the utility and paving contracting business, and to capitalize the new entities created by Steve Pate for that business.

(Docket Entry No. 38, Ex. 1, ¶ 138).  The Sureties also included several paragraphs clarifying the alleged role of each of the defendants, as well as identifying the acts allegedly committed by each defendant, the knowledge held by each defendant, and when the acts were committed.  Representative paragraphs and the detail they provide are set out below:

58.  Between the end of 1998 and February, 2001, Baine and Nelson, the partners of NEBA, through their accumulation of information about the financial condition of Enterprises, knew of the misuse of short-term loans. The 1998 off-book loan of $1 million dollars was not repaid on time.  As a result, NEBA retained an independent, outside accountant to audit the financial books and records of Enterprises, and she reported her findings to NEBA. Moreover, the banks of which Baine and Nelson were owners and directors, CSB and First State Bank, were lenders to Enterprises that received the false financial statements during the loan approval and renewal process prior to February, 2001.  Based on CSB's and First State Bank's access to Enterprises' financial records and statements, Baine and Nelson knew that the NEBA loans were not recorded properly in the general ledgers kept by Enterprises, knew that the timing of the loans from NEBA affected the reporting periods covered by the financial statements, knew that the NEBA notes were not disclosed in the financial statements, and knew that the contingent liability for Steve Pate's guarantees to NEBA were not disclosed either in his personal financial statements or in the financial statements for Enterprises.

59.  In spite of this knowledge, NEBA provided a new $800,000 loan to Enterprises on or about February 23, 2001, by wiring the money from an account at Industry Bank to Enterprises' account at Wells Fargo.  The promissory note evidencing the loan was created at First State Bank.  Although NEBA made the loan in its name, Nelson personally participated in 41.666%

of the loan by using funds provided by ENelson, and the partnership provided 58.333% of the loan.  The loan was for a 60-day period and stated that it was made "without interest".  The transaction was recorded by Fulp in account 2107, and the credit or liability was not reflected in the interim statements for Enterprises during fiscal 2001.

****

78.  On or about May 1, 2002, Steve Pate submitted the credit application to Baine for the Participation Loan.  Baine provided the credit application to Mieth, who provided Baine with a list of documents that would be required from LLC and the Pates before the loan could be approved, including a current balance sheet and income statement from LLC; LLC's tax returns; current financial statements, cash flow statements and tax returns for each brother (Steve, Richie, and Kevin); current accounts receivable information from LLC; credit reports on each brother; legal descriptions of the real estate being pledged as collateral; the articles of association for LLC; and appraisals for the real estate.  Mieth submitted the loan proposals to the loan committees of Industry Bank and Coupland Bank, which approved the loans on May 1, and May 3, 2002, respectively.  By May 3, 2002, Mieth had received some of the requested documents, including Steve Pate's personal financial statement, but had not received all of the requested documents.  Therefore, the approvals were made by both banks pending receipt of all of the requested documents.

79.  At the time of the proposal for the Participation Loan, Lindemann and Mieth knew that LLC was a new entity with little or no credit history, and that Enterprises had been the primary operating entity for the Pate family's utility contracting business, because of the representations contained in Steve Pate's personal financial statement and their prior meetings with Baine and Steve Pate about financing the new Woodlands facility; knew of Baine and Nelson's ownership and operation of NEBA as an unchartered, unlicensed, and unregistered lender; knew that representations made by Steve Pate in the application for the Participation Loan were false, because he did not disclose his guarantees to NEBA; knew of Baine and Nelson's personal financial interests in the bailout of LLC, as a result of the outstanding loans to LLC made by Nelson and NEBA, and by Industry Bank's participation in those loans; and knew that the documentation submitted by Baine to Mieth to support the loan did not meet the sufficiency requirements of the Industry Bancshares' banks.  With this knowledge, Lindemann and Mieth agreed with Baine and Nelson that CSB should not participate in the Participation Loan,

because of Baine and Nelson's membership on the board of directors and loan committee of CSB, but otherwise agreed to, and approved of the proposal for the Participation Loan.

80.  On June 5, 2002, First State Bank, Industry Bank and Coupland Bank closed the Participation Loan transaction, even though the credit files needed for proper approval still were incomplete.  As part of the transaction, the Participating Banks provided LLC with a new $2 million line of credit to LLC and took a lien on the collateral pledged to NEBA in April (even though no subordination agreement was provided by NEBA to the Participating Banks at this time).  In addition, First State Bank, Industry Bank and Coupland Bank took security interests in real estate owned by Enterprises and Steve Pate, which was simultaneously conveyed to LLC through a title company controlled by Baine's lawyer.  First State Bank also took security interests in 401k plan certificates of deposit, and personal certificates of deposits, collateral well in excess of the $500,000 First State Bank put at risk in the Participation Loan.  Also in June, 2002, the NEBA Loan was renewed.

81.  On June 13, 2002, prior to full funding of the Participation Loan, Mieth again requested, in writing, copies of documents, including LLC's tax return, needed to complete the credit file.  In a return fax, an officer of First State Bank states that no return had yet been filed, but that the K-1 forms for each brother should be sufficient, because LLC would be treated like a partnership for tax purposes.  By June 19, 2002, the Participation Loan was fully funded to LLC even though the credit files for proper approval and funding still were not complete.  The full $2 million was funded to LLC, in part, through wire transfers into and out of First State Bank's account at the Victoria Branch of Wells Fargo.

****

83.  The creation and funding of the Participation Loan under the circumstances existing as of mid-June, 2002, violated accepted banking practices.  By the time of the closing and funding of the loan, Baine, Nelson, Lindemann, Mieth, and the Participating Banks they controlled, each knew some or all of the following facts: that Enterprises, LLC and Steve Pate had falsified their respective financial statements, and the credit application for the Participation Loan, by concealing NEBA's loans and Pate's guarantees to NEBA; that Steve Pate lied on the credit application for the Participation Loan by stating that he had over $1 million in cash on deposit at First State Bank; that LLC had no significant credit or operational history to support the credit

being extended by the Participating Banks, and that Enterprises had been the primary operating company; that both Enterprises and LLC were in financial distress and subject to claims of trade creditors; that Enterprises had been in violation of the repayment terms of the short-term loans from NEBA during 2001 and 2002; that Wells Fargo and Citizens Bank of Texas had made claims against one or both of the companies, their affiliates and their principals, alleging that these parties had engaged in check-kiting activity that led to a loss of up to $5,000,000 by one or both of these banks; that Madisonville had found Enterprises in violation of its loan covenants related to the transfer of its collateral to LLC; that some or all of the collateral being pledged to secure the Participation Loan was subject to other security interests or creditor claims (of creditors other than NEBA), and that no notice of the new pledge to the Participating Banks was being given to the other secured parties; that LLC already was indebted to Baine, Nelson, and Industry Bank, through the NEBA Loan, for $1.95 million; that the credit information gathered to support the Participation Loan did not comply with bank requirements, or the specific terms of the loan approvals; and that, if the outstanding NEBA Loan was imputed to Industry Bank (and/or to the banks owned or controlled by Baine and Nelson), a direct loan to Steve Pate, any of his companies, or any of his family members, would violate loan/reserve requirements of the Participating Banks. Based on these known facts, the Participating Banks accepted the risk of default, and the full risk of loss of the principal amount of the funded line of credit, as of the date they approved the Participation Loan, or no later than the date the loan and related conveyances closed. The voluntary and intentional acceptance of such risks violated accepted banking procedures, policies and practices.

****

85. Industry Bancshares had retained an independent accounting firm, Cawthron, Wommack and Coker, P.C. ("CWC"), to conduct the Compliance Review for Industry Bank and Coupland Bank. During the Compliance Review, CWC raised questions about the Participation Loan. On or about the morning of August 6, 2002, Mieth passed one of CWC's questions to Baine, or Gaye Clement at First State Bank. The question concerned one of the parcels of real estate, located in LaFeria, Cameron County, Texas, supposedly transferred from Steve Pate to LLC on June 5, 2002, and pledged as collateral for the loan. Apparently, CWC questioned whether the parcel had ever been transferred, and whether the lien on the property was valid. In a mid-day fax, Clements advised Mieth that, in fact, title of the property had stayed in Steve Pate's name so that he could continue to receive lease payments from the

tenant on the property.  This fact showed that the status of the property on or after June 5, 2002, had been misrepresented to the Participating Banks. However, Clements told Mieth that Baine's lawyer, whose title company closed the June 5th conveyances, was assuring them that the "lien was just as valid as if the LLC owned the Cameron County property."   Without conducting a further investigation into the status of ownership and the validity of the lien, Mieth put the fax from Clements in the loan file for review by CWC.

(Docket Entry No. 38, Ex. 1, ¶¶ 58–59, 78–81, 83, 85).

The sufficiency of the proposed Second Amended Complaint to cure the deficiencies of the earlier pleadings is analyzed as to each of the two categories of loans alleged.

1.     *The Claims Against NEBA, Baine, Nelson, E. Nelson, and Industry Bank*

NEBA, Baine, Nelson, E. Nelson, and Industry Bank have filed motions to dismiss the claims arising out of the short-term loans made to Enterprises.  The claims against Baine, Nelson, Industry Bank, and NEBA based on the short-term loans — specifically, the February 2001 loan to Enterprises for aiding and abetting and conspiracy to commit breach of fiduciary duties —  withstand the motion to dismiss.  The Sureties alleged that each of these defendants had specific knowledge and intent to aid Enterprises, Pate, and Fulp in breaching their fiduciary duties to the Sureties.  In particular, paragraphs 57 through 61 of the Second Amended Complaint allege the requisite specific intent for a conspiracy claim, and the requisite gross negligence or intent to support claims of an aiding and abetting breach of fiduciary duty, aiding and abetting fraud, and conspiracy to commit fraud.  *Cf. Tri*, 162 S.W.3d at 556.

The proposed Second Amended Complaint makes similarly specific allegations relating to the February 2002 loan. (*See* Docket Entry No. 38, Ex. 1, ¶¶ 71–72). As to these claims, the motions to dismiss are denied and the motion for leave to file the proposed Second Amended Complaint is granted.

The conspiracy and aiding and abetting breach of fiduciary duty claims against Baine and Nelson for their involvement in arranging the Participation Loan in June 2002 are also sufficient to withstand the motions to dismiss as to the claims of aiding and abetting and conspiracy to breach fiduciary duties owed to the Sureties. Both defendants allegedly knew that the primary actors were violating the fiduciary duties they owed to the Sureties and specifically intended to assist in these violations.

The aiding and abetting fraud claims, however, fail as to the Participation Loan. The encumbrance of assets allegedly achieved by the Participation Loan took place in June 2002, months after the Sureties had stopped issuing bonds. (Docket Entry No. 38, Ex. 1, ¶¶ 79–81, 83–97). According to the Second Amended Complaint, the Sureties stopped issuing bonds to Enterprises and LLC on May 31, 2002. (Docket Entry No. 38, Ex. 1, ¶ 38). Reliance by the plaintiff is an element of fraud. *Cf. Formosa Plastics Corp. USA*, 960 S.W.2d at 47. The Sureties could not have relied on the availability of the assets allegedly encumbered by the defendants in June 2002 to issue bonds in May 2002. The Sureties have not alleged facts showing that they relied on the availability of the encumbered assets to their detriment after May 31, 2002, as required to recover for this cause of action. The claims of aiding and abetting and conspiracy to commit fraud against these defendants arising out of the June

2002 Participation Loan are dismissed, and the motion to assert this claim in the proposed Second Amended Complaint is denied as futile.

> 2. *The Claims Against Mieth, Lindemann, and the Participation Loan Banks*

The motions to dismiss the aiding and abetting and conspiracy to commit fraud claims against Mieth and Lindemann and the banks that they served as directors and officers that approved the Participation Loan are granted, without leave to amend. The aiding and abetting and conspiracy to commit fraud claims are dismissed for lack of any allegation of reliance.

The claims against Mieth, Lindeman, and the Participation Banks for aiding and abetting the breach of fiduciary duty withstand the motion to dismiss. The proposed Second Amended Complaint alleges that this group of defendants knew of the fiduciary obligations of Enterprises and LLC to the Sureties, knew the financial condition of Enterprises and LLC, and assisted in encumbering collateral to which they knew the Sureties had superior legal claims. (Docket Entry No. 38, Ex. 1, ¶ 108). The motion to dismiss the aiding and abetting and conspiracy to breach fiduciary duty claim is denied, and the motion to file these portions of the proposed Second Amended Complaint is granted.

**D.   The Motions to Dismiss the Claims of Aiding and Abetting in and Conspiracy to Make Negligent Misrepresentations**

The Lender Defendants have moved to dismiss the claims of aiding and abetting and conspiracy to make negligent misrepresentations. The Sureties respond that they are not asserting any claim for negligent misrepresentation. (Docket Entry No. 39 at 13). This court

grants defendants' motion to dismiss the claims for aiding and abetting negligent misrepresentation.

### E.    The Fraudulent Transfer Claims

The Lender Defendants contend that the fraudulent transfer claims should be dismissed because: (1) these defendants are not "insiders" as defined by the Texas Uniform Fraudulent Transfer Act; (2) this Act does not prohibit payment of a valid, preexisting debt; and, (3) to the extent the claims seek recovery for conduct before the four-year statute of limitations, those claims must be dismissed.  The Lender Defendants also challenge whether these claims are pleaded with the particularity required under Rule 9(b).

Texas has adopted the Uniform Fraudulent Transfer Act (TUFTA).  TEX. BUS. & COMM. CODE ANN. § 24.000 (Vernon's 2002).  Under TUFTA, a creditor's claim for fraudulent transfer requires a showing that the debtor made the transfer or incurred the obligation:

(1)    with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2)    without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A)  was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B)  intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

TEX. BUS. & COM. CODE ANN. § 24.005(a) (Vernon's 2002).  In determining actual intent

under subsection (a)(1), consideration may be given, among other factors, to whether:

> (1)     the transfer or obligation was to an insider;

> (2)     the debtor retained possession or control of the property transferred
>          after the transfer;

> (3)     the transfer or obligation was concealed;

> (4)     before the transfer was made or obligation was incurred, the debtor had
>          been sued or threatened with suit;

> (5)     the transfer was of substantially all the debtor's assets;

> (6)     the debtor absconded;

> (7)     the debtor removed or concealed assets;

> (8)     the value of the consideration received by the debtor was reasonably
>          equivalent to the value of the asset transferred or the amount of the
>          obligation incurred;

> (9)     the debtor was insolvent or became insolvent shortly after the transfer
>          was made or the obligation was incurred;

> (10)    the transfer occurred shortly before or shortly after a substantial debt
>          was incurred; and

> (11)    the debtor transferred the essential assets of the business to a lienor who
>          transferred the assets to an insider of the debtor.

TEX. BUS. & COM. CODE ANN. § 24.005(b) (Vernon's 2002).

Transfers to secure preexisting debt are permissible as long as reasonably equivalent

value is given for the transferred asset.  TEX. BUS. & COM. CODE ANN. § 24.004 (Vernon's

2002).  Under TUFTA, "reasonably equivalent value" is transferred if the creditor obtains

a security interest in collateral up to the amount of the debt.  *See First Nat'l Bank of Seminole v. Hooper*, 104 S.W.3d 83, 86 (Tex. 2003).

The four broad categories of "insiders" are: (1) relatives of the debtor; (2) partners of the debtor; (3) general partners of the debtor; and (4) corporations controlled by the debtor. Under the statute, if the debtor is a corporation, an "insider" is defined as:

> (i)    a director of the debtor,
>
> (ii)   an officer of the debtor;
>
> (iii)  a person in control of the debtor;
>
> (iv)   a partnership in which the debtor is a general partner;
>
> (v)    a general partner in a partnership described in Subparagraph (iv) of this paragraph; or
>
> (vi)   a relative of a general partner, director, officer, or person in control of the debtor.

TEX. BUS. & COMM. CODE ANN. § 24.002(7)(B) (Vernon's 2002).  The definitions provided in the statute are merely illustrative, not a rigid list.  *See Holloway v. Allison*, 955 F.2d 1008, 1010–11 (5th Cir. 1992); *Money Purchase Pension Plan v. Stephenson*, 805 S.W.2d 16, 18 (Tex. App. – Dallas 1991).  Because the TUFTA definition of "insider" is similar to the definition of "insider" used in the Bankruptcy Code, 11 U.S.C. § 101(31), and because there are many cases decided under the Code, these cases are useful precedent.  *Holloway*, 955 F.2d at 1010.  These cases "generally have focused on two factors" in determining whether a party is an "insider" for the purpose of the TUFTA: "(1) the closeness of the relationship between the transferee and the debtor; and (2) whether the transactions between the

transferee and the debtor were conducted at arm's length." *Id.* (citing *In re Friedman*, 126 B.R. 63, 70 (9th Cir. B.A.P. 1991)).

The Lender Defendants argue that the Sureties have failed to allege facts that might support an inference that these defendants were "insiders." The fraudulent transfer claims against each of the Lender Defendants are analyzed separately.

> 1. *The Fraudulent Transfer Claims Against NEBA, Baine, Nelson, and E. Nelson*

The Sureties allege that NEBA, which is controlled by Baine and Nelson, the general partners, provided Enterprises with interest-free short-term loans even after knowing that the Pate entities were not properly recording those loans. The Sureties allege that NEBA continued to renew loans to the Pate enterprises that these entities failed to disclose to their auditor. The Sureties allege that NEBA made loans to Enterprises, LLC, and other Pate entities after knowing that they were insolvent, in order to encumber the assets of those entities, conceal them from the Sureties, and enable the Pate entities to continue to control those assets. The Sureties allege that NEBA engaged in improper funneling of money into, out of, and between the Pate business entities. The Sureties allege that Nelson and E. Nelson contributed their personal funds to loans NEBA made to Enterprises, and that Baine and Nelson received loans that were in turn used to fund NEBA's loans to LLC. The Sureties further allege that each of these defendants encumbered assets without consideration with the intention of defrauding Enterprises's and LLC's creditors. The Sureties have alleged a violation of Tex. Bus. & Com. Code Ann. § 24.005(a).

The Sureties have also sufficiently alleged that Baine was an insider with respect to Steven Pate, Enterprises, LLC, and other Pate Entities. According to the proposed Second

Amended Complaint, Baine and Steven Pate were long-standing friends who had done business together for years.  As alleged, Baine vacationed with Steven Pate; made personal, often interest-free, loans to Steven Pate; and coordinated and facilitated Steven Pate's banking relationships.  (Docket Entry No. 38, Ex. 1, ¶ 46).  The Sureties allege that Baine went to extraordinary lengths to protect Steven Pate's business interests.  The Sureties allege that as a general partner with Nelson in control of CSB and First State Bank, Baine controlled NEBA.  (*Id.* at ¶ 55).  Through NEBA, Baine and Nelson obtained a lien on the assets of LLC, and thereby controlled Enterprises and LLC.  As alleged, Baine and Nelson directed which of Enterprises's and LLC's creditors would be paid and how the assets would be used — including the decision to allow the Pate family to convert the entities' assets for personal use.  (*Id.* at ¶¶ 66–97).  The Sureties allege that Nelson and E. Nelson contributed their personal funds to loans NEBA made to the Pate entities.  (*Id.* at ¶¶ 59, 61).  The Sureties have pleaded a close relationship between Baine and, through Baine, NEBA and Nelson (who allegedly controlled E. Nelson) on the one hand, and the Pate entities on the other.  *Cf. Putman*, 805 S.W.2d at 18–19 (finding "insider" status in a case in which the parties engaged in social activities together, involved each other in business discussions and decisions, and in which the lending party had "personal knowledge of the business, financial, and personal affairs" of the debtor).  The Sureties have also pleaded facts that support an inference that the lending activity was not conducted at arms-length and that the loans made after Baine and Nelson knew that Enterprises was not properly recording the NEBA loans and that the Pate entities were in financial distress were not commercially motivated.  *See, e.g.*, *In re Standard Stores, Inc.*, 124 B.R. 318, 325 (Bankr. C.D. Cal. 1991) (whether a party made a large loan

on an unsecured basis without further inquiry into the debtor's ability to repay is significant in determining whether the transaction was conducted at arms length).  The pleadings of "insider" status against Baine, Nelson, and E. Nelson withstand the motion to dismiss; the motion for leave to file the Second Amended Complaint to assert fraudulent transfer claims and the related conspiracy claims, (*see* Docket Entry No. 38, Ex. 1, ¶ 138), against these defendants is granted.

2. *The Fraudulent Transfer Claims against Mieth and Lindemann*

The proposed Second Amended Complaint also pleads particular allegations against Mieth and Lindemann, the Officer and Director Defendants who approved the Participation Loan for the Participation Loan Banks.  (Docket Entry No. 38, Ex. 1, ¶¶ 91–95).  The proposed Second Amended Complaint alleges that Mieth and Lindemann were insiders of LLC and Enterprise or transferred assets to insiders without receiving reasonably equivalent value while having knowledge of the entities' imminent insolvency.  *Cf.* TEX. BUS. & COM. CODE ANN. § 24.005(a).  Unlike the allegations against Baine and Nelson, which included specific allegations relating to "insider" status, however, the proposed Second Amended Complaint alleges no facts showing that Mieth and Lindemann were "insiders" of the Pate entities.  The proposed Second Amended Complaint fails to allege that Mieth or Lindemann fit under any of the statutory definitions of "insider," TEX. BUS. & COMM. CODE ANN. § 24.002(7)(B), and fails to allege facts that could support an inference of insider status as illustrated by the caselaw.  *Cf. Holloway*, 955 F.2d at 1010–11.  Additionally, the Sureties have failed to assert these fraud-based claims against these two defendants with sufficient particularity.  The proposed Second Amended Complaint fails to allege that the lien imposed

to secure the Participation Loan with the approval of Mieth and Lindemann lacked valid consideration.  The fact that these individuals approved a Participation Loan secured by a lien that is not alleged to exceed the loan amount, or that the loans allegedly violated accepted banking practices, do not make the encumbrances or alleged transfers fraudulent. Mieth and Lindemann's motions to dismiss the fraudulent conveyance claims are granted.[2] Given the number of efforts to amend, the Sureties' motion for leave to amend the complaint as to the fraudulent transfer claims against these two defendants is denied as futile.

### H.    The Denuding Claims

Lindemann, Mieth, Industry Bancshares, and Industry State Bank move to dismiss the denuding claim on the ground that the Sureties lack standing to bring this claim against these defendants.  The Sureties do not allege that these defendants were shareholders of Enterprises or LLC.  (Docket Entry No. 48, ¶ 4).

Lindemann, Mieth, Industry Bancshares, and Industry State Bank rely on *S.I. Acquisition, Inc. v. Eastway Delivery Service, Inc.*, 817 F.2d 1142 (5th Cir. 1987), in support of their position.  That case discusses Texas law governing piercing of the corporate veil. Among the cases *S.I. Acquisition* discusses is *In re Mortgage America*, 714 F.2d 1266 (5th Cir. 1983).  In that case, the Fifth Circuit observed, "under Texas law a cause of action under the trust fund (denuding) theory is a right of the corporation, though, to be sure, that right is assertable (and usually is asserted) by the corporation's creditors."  *S.I. Acquistion, Inc.*, 817

---

[2]    Additionally, because the motion to dismiss the fraudulent transfer claims is granted, the motion to dismiss the related conspiracy to commit fraudulent transfer and/or encumber assets (Docket Entry No. 38, Ex. 1, ¶ 138), is also dismissed.  *See Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996) (holding that conspiracy is a derivative tort and that a defendant's liability for conspiracy is therefore predicated on participation in an underlying tort).

F.2d at 1149 (quoting *In re Mortgage America*, 714 F.2d at 1276–77).  The Sureties contend that this language requires denial of the motion to dismiss.  Defendants argue that this language means that a creditor can bring a denuding action only *if* the defendants are shareholders.

An action for denuding lies only against a shareholder under Texas law.  The fact that a creditor may assert a denuding action against an individual shareholder defendant does not mean that a creditor may assert a denuding action against *any* individual defendant.  A denuding theory is a means of piercing the corporate veil; the creditor may bring such an action against a shareholder as a means of recovering directly from that shareholder in lieu of the corporation.  *Cf. Menetti v. Chavers*, 974 S.W.2d 168, 175–76 (Tex. App – San Antonio 1998) (citing *Huff v. Harrell*, 941 S.W.2d 230, 237 (Tex. App. – Corpus Christi 1996, writ. denied)).  The Sureties clarify the denuding allegations in the proposed Second Amended Complaint.  (Docket Entry No. 38, Ex. 1, ¶ 118).  Because they have not alleged that any of the defendants who allegedly "denuded" are shareholders of LLC or Enterprises, these defendants cannot be held personally liable under a denuding theory for the actions taken by those who allegedly misused the entities involved.

To the extent the motion requests dismissal of the denuding action directly against these defendants, it is granted.  To the extent the motion requests dismissal of the claim that these defendants aided and abetted Steven Pate and other shareholders of Enterprises and LLC in denuding these entities, the motion is denied.  The Sureties have alleged that these defendants aided and abetted Steven Pate, a shareholder of Enterprises and LLC, in their efforts to denude the corporate entities as a vehicle to pierce the corporate veil of LLC and

Enterprises.  *See* TEX. BUS. CORP. ACT. ANN. § 2.21 (Vernon Supp. 1998); *Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986); *see also Menetti v. Chavers*, 974 S.W.2d 168 (Ct. App. Tex. – San Antonio, 1998) (discussing the state of the law in Texas on veil-piercing).  The proposed Second Amended Complaint sufficiently alleges a claim of aiding and abetting the denuding of LLC and Enterprises to withstand dismissal.[3]

### F.     The Negligence Claims

The Lender Defendants contend that the negligence claims should be dismissed.  In the proposed Second Amended Complaint, the Sureties have dropped the negligence claims against all the defendants except Fulp, who has not filed a motion to dismiss.  (*See* Docket Entry No. 38, Ex. 1, ¶¶ 141–44).  The motions to dismiss the negligence claims are granted, without leave to amend.

### G.     The Fraudulent Concealment Claim

The Sureties allege fraudulent concealment to toll the statute of limitations.  The elements of fraudulent concealment are that: (1) the defendant had actual knowledge of the wrong committed; (2) the defendant concealed the wrong by making a misrepresentation or by remaining silent when he had a duty to speak; (3) the defendant had a fixed purpose to conceal the wrong; and (4) the plaintiff reasonably relied upon the misrepresentation or silence.  *Shah v. Moss*, 67 S.W.3d 836, 841 (Tex. 2001); *Earle v. Ratliff*, 998 S.W.2d 882, 887 (Tex. 1999).  "Fraudulent concealment tolls the statute of limitations until the plaintiff discovers the fraud or could have discovered the fraud with reasonable diligence."  *Shah*, 67 S.W.3d at 841 (citing *Velsicol Chem. Corp. v. Winograd*, 956 S.W.2d 529, 531 (Tex. 1997)).

---

[3]     The proposed Second Amended Complaint is sufficiently clear to enable defendants to frame a responsive pleading.  The alternative motions for a more definite statement are denied.

Although fraudulent concealment is not itself a distinct cause of action, it must be pleaded with particularity.  *See* FED. R. CIV. P. 9(b); *Guerrero v. Gates*, 357 F.3d 911, 919 (9th Cir. 2004) (citing *Conerly v. Westinghouse Elec. Corp.*, 623 F.2d 117, 120 (9th Cir. 1980)); *United States ex rel. Clausen v. Lab. Corp. of America, Inc.*, 290 F.3d 1301, 1310 (11th Cir. 2002) (citing *Summer v. Land & Leisure, Inc.*, 664 F.2d 965, 970–71 (5th Cir. Unit B 1981)); *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 191 (2d Cir. 2001); *Ingram Corp. v. J. Ray McDermott & Co., Inc.*, 698 F.2d 1295, 1305 (5th Cir. 1983).

The Lender Defendants argue that the fraudulent concealment allegations should be dismissed because the Sureties have failed to plead fraudulent concealment with particularity, as required by Rule 9(b).  The proposed Second Amended Complaint contains more detailed allegations of fraudulent concealment than the earlier complaints.  In addition to the portions quoted above, the proposed Second Amended Complaint contains the following specific allegations:

> 99.  Also concealed from the Sureties, by the summer of 2001, Enterprises was, or was rapidly becoming, insolvent. In fact, on or about July 13, 2001, Enterprises declared to one of its largest creditors that it could not meet its financial obligation to that creditor.  Such insolvency was caused, in whole or in part, by fraudulent transfers of funds to insiders, and a decrease in receivables.  The insolvency was hidden, and continued to be hidden from other creditors, such as USF&G and FGIU, in whole or in part, by the off-book extensions of credit provided by and through NEBA, which coincided with fraudulent transfers of assets from the books of Enterprises to LLC and others, and the preparation and dissemination of false financial reports and analyses concerning Enterprises and LLC for use by their creditors, including USF&G and FGIU. USF&G and FGIU neither knew, nor should have known, nor in the exercise of reasonable diligence should have discovered the manipulation of the books and the true financial condition of Enterprises or LLC or the denuding of Enterprises and LLC through transfers to the detriment of the Sureties.

100. Eventually, the elaborate scheme to defraud creditors and conceal the financial condition of Enterprises and LLC unraveled, but not before its continuation damaged the Sureties. To continue to hide the insolvency of Enterprises and LLC, Fulp created false financial data to inflate the tangible net worth of the companies, which financial data coincidentally failed to disclose the debt of the companies. Each of the Defendants knew, or should have known, that such financial statements were false and that Enterprises and LLC were engaged in a fraud on creditors and knew, or should have known, that any collateral pledged during this time was a denuding of the corporation and a fraudulent transfer of assets to the detriment of creditors, including the Sureties. Moreover, each of the Defendants knew, or should have known, that extensions of credit to LLC and Enterprises were being used to prop-up insolvent businesses to the detriment of its creditors.

(Docket Entry No. 38, Ex. 1, ¶¶ 99–100).

Combined with the other allegations that have withstood the motions to dismiss and may proceed in the proposed Second Amended Complaint, the Sureties have sufficiently pleaded the elements of fraudulent concealment to withstand the motion to dismiss. The motions to dismiss this basis for avoiding limitations are denied; the motion for leave to amend to assert fraudulent concealment in the proposed Second Amended Complaint is granted.[4]

## F.    The Prayer for Attorney's Fees

The Sureties concede that they cannot recover attorney's fees for the causes of action asserted. (Docket Entry No. 39 at 14). The motion to dismiss the Sureties' prayer for attorney's fees is granted, without leave to amend.

## G.    The Prayer for Injunctive Relief

Industry State Bank and Lindemann argue that the Sureties' prayer for injunctive relief should be dismissed. (Docket Entry No. 28 at 11). The Sureties respond that

---

[4]       The Second Amended Complaint is sufficiently clear to enable defendants to frame a responsive pleading. The alternative motions for a more definite statement are denied.

injunctive relief is available under the Texas Business & Commerce Code, based on the allegations of fraudulent conveyance. (Docket Entry No. 39 at 13–14). The Sureties do not seek injunctive relief for any other cause of action. The Sureties correctly argue that the Texas Business & Commerce Code makes injunctive relief available to a prevailing party with a valid claim of fraudulent conveyance. TEX. BUS. & COM. CODE ANN. § 24.008 (Vernon's 2002). The motion to dismiss the prayer for injunctive relief is granted and the motion for leave to assert this claim in the proposed Second Amended Complaint is denied as to Mieth and Liedemann. As to the remaining defendants against whom the Sureties have alleged fraudulent transfer, the motion to dismiss the prayer for injunctive relief is denied, and the motion for leave to assert this claim in the proposed Second Amended Complaint is granted.

## V.     Conclusion

The motion for leave to file the Second Amended Complaint is granted in part and denied in part. The motion to strike is granted. The motions to dismiss the original and First Amended Complaints are granted in part and denied in part, and the motion for leave to file the proposed Second Amended Complaint is granted in part and denied in part. The alternative motions for a more definite statement are denied. This court will hold a status conference on **January 12, 2006 at 9:30 a.m.** in Courtroom 11-B.

SIGNED on December 16, 2005, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge